This next case is case number 4-16-0747, Stephen Englum v. The City of Charleston, and appearing for the appellant is Attorney Isley. Appearing for the appellee is Attorney Wetzel. Good morning. Good morning. Counsel, before we begin, note here that Justice Steitman will be on the panel deciding this case today due to a death in the family. However, oral arguments are being recorded, and he will have access to the recording of argument, and he will be a fully participating member of the panel deciding the case. All right, Mr. Isley, you may proceed. Thank you, Your Honor. May it please the Court, Counsel, my name is Britt Isley. I represent the City of Charleston, the appellant in this case, actually in these two appeals that are consolidated before you. I'll quickly summarize both cases. Both cases deal with issues under the Public Safety Employee Benefit Act. The first case deals with the City's ordinance that creates a hearing process to determine eligibility by police officers and firefighters to health insurance benefits under the Public Safety Employee Benefit Act. Coles County Circuit Court denied the City's request to dismiss Inglom's complaint for injunctive relief. That complaint for injunctive relief was to avoid the City's hearing process, where by ordinance they created a hearing by which eligibility to PSEPA benefits would be determined. Instead, Mr. Inglom got a declaratory judgment from his second case with Coles County Circuit Court ruling on his eligibility for PSEPA benefits. We argue that he should have exhausted his remedies at the City of Charleston going through the City's hearing process, and so this declaratory judgment action was simply not right. The second appeal deals with that declaratory judgment action. In the alternative, if this Court finds against the City in the first appeal having to do with creation of a hearing process under an ordinance and allows the injunctive relief to Inglom, the City then argues that in the second appeal, the Coles County Circuit Court acted against the manifest weight of the evidence in ruling that Inglom suffered a catastrophic injury while responding to what is reasonably believed to be an emergency. Mr. Issa, just as a matter of procedure, based on my review of the record of briefs, it doesn't appear that there was ever an order entered relative to the complaint for injunctive relief. You're right, actually. So how can you appeal a non-existent order? Because in looking at the notice of appeal, there are two separate notices of appeal. The one in 14 CH6, which is the complaint for injunctive relief, it references the September 6, 2016 order, but you would acknowledge that order does not provide any relief to either party relative to the complaint for injunctive relief. You're right. It mentions the other case from December 2015, that order, which in my mind was an interlocutory order. It wasn't a final order on both cases. What we're asking for is that essentially the motion to dismiss brought by the city in the complaint for injunctive relief be granted and that that complaint be dismissed altogether. So that's the relief we're asking for in this first appeal dealing with the ordinance by the city of Charleston. In that first case, regarding the city's PCEVA ordinance, for police officers, we know that there's no automatic entitlement to benefits under PCEVA. In other situations where our municipal clients get a request from a police officer or a line of duty pension, it's sort of an insufficient and ineffective response to just send back a letter saying you've been granted PCEVA benefits or you've been denied the benefits. We find that it's fairer to have and under due process provisions to enact the type of procedures and who determines eligibility to PCEVA benefits. So again, this is a state statute that doesn't explain how it's to be administered. So the city of Charleston believes that it has municipal powers, that it are implied by the grant of general powers under the Illinois Municipal Code, giving it, a non-home rule municipality, the power to create such an ordinance to create hearings. And it does so in other situations. For example, revocation of liquor license hearings. There is no state statute that describes how a hearing should be set up to either grant a liquor license or take it away from someone. Or pre-termination hearings for a person who might be getting a warning for an employment reason and who may ultimately have his employment terminated. Such hearings aren't created through state statute. There are even opportunities through hearings for your water to get turned off. And again, that's not created by state statute. The municipality creates these hearings in order to effectuate the state statute that gives the municipality the power to do these things. And it did so in this case, too, to effectuate the power to either grant or deny PCEVA benefits. Ordinance 13037, that's the ordinance we're talking about here, provides the due process protections within its ordinance. Due process protections such as sworn testimony at the hearing, cross-examination of witnesses, a retired judge to rule on objections during the hearing, and also a record on appeal. So if the police officer or firefighter doesn't get the result he wants, he or she wants in the PCEVA hearing, it can be appealed to the circuit court. And under the Administrative Review Act, can be reviewed by a circuit court judge. And finally, this hearing process is already used by home rule municipalities, such as the Village of Hoffman Estates and the Village of Vernon Hills. We've cited to those ordinances in our brief. So for England to argue that the use of such a hearing is unconstitutional is inaccurate. Peterson versus the Village of Hoffman Estates already found that a home rule unit may employ such an administrative process for assessing PCEVA claims without acting in a manner that's inconsistent with the PCEVA statute. So, in conclusion on this first appeal, we would ask that this court reverse the circuit court's denial of the city's motion to dismiss England's complaint for injunctive relief and dismiss England's complaint for injunctive relief, allowing England then to avail himself of the city's hearing process for PCEVA benefits through its ordinance. Mr. Isley, again, just in terms of the relief you just requested and what's contained in the brief, you're asking the court to reverse an order that doesn't exist. To reverse an order that denied our motion to dismiss. There is no denial of the motion to dismiss relative to 14CH6, though. 14CH6 being? That's the complaint for injunctive relief. It would seem to me that what you're wanting to request is reversal of the order that denied the motion to dismiss the DEC action, which would basically put the parties back in court in the still viable 2014CH6 case. That's the complaint for injunctive relief that, for all intents and purposes, remains pending because the trial court's order that was entered on September the 6th, 2016, this simply says to the extent that any matters remain pending in 14CH6, this opinion is intended to represent a final ruling in regard thereto. That's not disposing of 14CH6. So it would appear to me that the parties still have a pending action in 14CH6. Well, you might be right. There wasn't a final ruling on 14CH6 about the complaint for injunctive relief. Certainly our next appeal that deals with the declaratory judgment, we ask for a reversal on that. I just pointed out what I did because procedurally I don't believe it's accurate in terms of your request for relief relative to 14CH6. So I don't mean to interrupt your argument that you were going to proceed to 14CH5. Right. Let me do that and maybe it will make more sense when my career for relief on that one. For the second appeal dealing with Englom's eligibility for health insurance benefits under PACEBA, we're arguing it's against the manifest way to the evidence for Coles County Circuit Court in that action to have found that Englom was injured in response to what is reasonably believed to be an emergency. And the key case in reviewing such emergency responses and PACEBA claims is Gaffney versus the Board of Trustees of Orland Park Fire Protection District. It's the Illinois Supreme Court case that gives the elements of what constitutes an emergency in these PACEBA cases. And the Circuit Court didn't cite to that case in its final order. Gaffney defines an emergency for purposes of 10B of PACEBA as being first an unforeseen circumstance involving two, an imminent danger to a person or property, requiring three, an urgent response. Here, Englom perhaps meets the first of the three elements. In other words, the unforeseen circumstance of not finding his police chief during his investigation, the police chief that allegedly made the call for a dispatch to be made. But he fails the other two elements. There's no imminent danger to a person or property in this case. Not at Casey's General Store that he goes to first, nor to the police station he goes to second. And there's no urgent response that was required by Englom. There are no facts here which prove that Englom was responding to what is reasonably believed to be an emergency. So that's why it's against the manifest way of the evidence for Coles County to have decided otherwise. Also in Gaffney, a firefighter in that case stuck in a burning building with smoke. The court notes in Gaffney that that firefighter had no option of ending his participation in such an emergency situation once it became an emergency. Here, Englom did have the option of ending his investigation. And he did, in fact, end it, going back to the police station when he found no problems at Casey's General Store. I also used the examples in my brief of the two police officers in Springborn versus the village of Sugar Grove. Officer Springborn observing a field of asphalt debris in the highway, activating his emergency lights, and then parked behind the asphalt pieces in the road to protect against the traffic running into this asphalt field. Ultimately, he hurt his back. Springborn felt that the asphalt chunks created an emergency situation and an immediate safety hazard. And so did the second appellate court in that case. Again, citing Gaffney, saying that there was an unforeseen circumstance, being that field of asphalt debris, involving an imminent danger to personal or property, that being the danger to oncoming traffic, and an urgent response was needed. And that urgent response was given by Officer Springborn. So here, all three elements were found, and ultimately, the second district appellate court found that there was, he was responding to what he reasonably believed was an emergency. But for Inglom, by contrast, on that date that he had this dispatch, on December 7, 2008, Inglom testified that from the CTOM call, there was no indication that there was a crime or an emergency in progress. Once he arrived at Casey's General Store, there were no circumstances involving imminent danger to a person or property. And once he left Casey's and went to the police department, still, there were no circumstances of imminent danger to a person or property. Inglom never activated his patrol car lights or his siren during the call, although that's not necessarily an indication of an emergency. It certainly shows that Inglom didn't feel there was a hazard. And he never encountered hazards in the roadway, like the officers in Springborn. Inglom, in fact, testified on cross-examination that he never saw anyone having an emergency when he approached Casey's. And once he arrived at the police station, he said he still had no indication of an emergency. So here for Inglom, it's, again, against all manifest weight of the evidence for Coles County to have found that Inglom was responding to what he reasonably believed was an emergency in progress. There are no facts of an imminent danger to a person or property, as GAFNI requires, and there are no facts for a need for an urgent response, as GAFNI requires. Because the September 6, 2016, Coles County Circuit Court order is against the manifest weight of the evidence, the city prays in this case for a reversal of that order, finding he is not entitled to health insurance benefits under PCEBA. Thank you. Okay, thank you. Mr. Wetzel. May it please the Court, Counsel, good afternoon, or I guess it's still morning. Justice Harris, you brought up an excellent point procedurally that I completely missed. I was trying to review my record in my file beforehand to see exactly how this was recorded. 14CH6 was definitely the motion, the complaint for injunctive relief, and 14CH5 was the deck action as you described it. I know that Justice Ryder heard argument on that motion for affirmative defense. I know that Mr. Isley had filed an affirmative defense for that action, and that action was heard, and an opinion was rendered saying that, I think she cited GAFNI for the reason why the deck action was proper, but I don't see an order indicating that finding, whether it was done in 14CH5 or 14CH6. I believe it was called under 14CH5, and a ruling, or at least an opinion, was rendered indicating that based on the decision in GAFNI, she was of the opinion that the deck action was the appropriate remedy based on the language there. Now, is it right for appeal? I don't know. I didn't review that before coming here, and I don't have that answer, but that was a very good catch on your part by seeing that procedure late on 14CH6. I don't have an answer to that question today, and I apologize. To address it, though, if the court wishes me to, in hindsight, if their action was whether they had the authority to enact the ordinance in 13037. Well, it would appear that the argument that you make in 14CH5, the deck action, really, if the court were to reverse the trial court's decision relative to the award of benefits, and, in essence, find that the trial court erred in denying the motion to dismiss, what would be happening is the case would revert back to the trial court for hearing, or it wouldn't revert to the trial court. There would be, I suppose, the issue relating to the complaint for injunctive relief, and if we found that the motion to dismiss was proper in the deck action, that would guide the trial court in its ruling on the complaint for injunctive relief, because it would be a finding that the ordinance was the proper way to proceed. It is a little confusing. I don't want to keep you from making your argument here today, but the two interrelate very closely. And I would agree that if the court comes down and says that the motion to dismiss was proper, it should have been granted that I would more than likely withdraw 14CH6 based on this court's finding. It would be a moot point at that point, because you've already made the determination that 13037, the ordinance, would preempt any action under the circuit court. So to address the motion to dismiss, Mr. Isley has cited a few cases, the Hoffman Estate case. It dealt with a home rule unit. I think there's a couple questions here. Number one, does the city of Charleston have the authority to enact the ordinance in the first place? And second, if they did have the authority to act, is Mr. England prevented from seeking remedy at the circuit court before exhausting his remedies in 13037? First of all, there's a difference. With a home rule unit, every rulemaking authority granted to it from a municipality is granted statutorily or through, as the defendant correctly points out in his proclivity, through the Illinois Constitution, Article 7, Section 6A. The court knows it's the home rule unit, and it grants municipalities broad power to govern and set agencies. The statutory language of that is, I wrote it down, except as limited by this section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs, including, if not limited to, the power to regulate for the protection of the public health, safety, morals, and welfare, to license, to tax, and to incur debt. But Charleston is not a home rule unit. It's not authorized under here. We agree that there's been Illinois courts that decided, based upon this language, that home rule municipalities can grant, can do administrative actions and agencies, and find whether somebody is eligible under Section 10, Benefits Under Procedure. What would be the rationale for not allowing the city of Charleston to enact an ordinance relative to the procedures to be employed in making this determination, yet the statute is silent on it? I think it goes to the theory behind the home rule unit to begin with. I did not go back and research the reasoning for the 1970 article in the Illinois Constitution. The home rule unit is $25,000. Anybody over $25,000 is automatically a home rule unit, or if they are, pass a referendum. Charleston tried to pass that referendum. It was denied. They didn't pass the referendum. The reasoning, at least in my theory, is that we do not want a small town to be able to govern said agencies that's going to be consisting of the same individuals, whether it's the city of Charleston has, for instance, in this case, a person on the pension board is also an individual I would apply to do insurance benefits, which is also a very small community. Everybody knows everybody, and biases can become a problem. I'm not saying that is the reason, but legally-wise, what statute grants them that authority? They say it's the municipal code, and I would direct, of course, attention to the Gaffney decision that talks about the Fire Protection Act. That's what the circuit court found. It relied on the language of Gaffney versus the Board of Trustees, the Orland Fire Protection District. It stated that SEBA benefits is a separate statutory benefit. It is not a part of the Fire Protection District Act. As such, the determination of eligibility for benefits under SEBA is not subject to the district's authority. You do this with the municipal code, it's the same way. SEBA is not under the municipal code.  It's somebody who is employed in the public safety field. So there's no authorization from the legislature to grant the city to adopt an administrative agency. For that, there's just nothing there. They direct it to the municipal code, but the Gaffney decision clearly indicates that that's not correct. It's not a home rule. So its rulemaking authority is only what's granted through statute, and it's not there. Additionally, I would like to bring this procedurally to the court's point that we had applied for benefits through SEBA prior to this enactment of 13037. So we have applied for benefits, and then all of a sudden they create this ordinance. My client, Mr. England, after the Supreme Court affirmed this court's affirming of the circuit court's reversal of the pension board's case, he immediately applied for insurance benefits. He did it a couple of times, but he didn't get any answers. He came to me and I orally asked for those, and they said I had to file for a written application. They had to write an application for it, so I just sent a letter saying we're requesting SEBA benefits, and this is the reason why. And that letter is in the record. A month later, all of a sudden we have an ordinance. Mr. England has fought this case since 2008. He's fought them every step of the way, whether it's workers' comp, the pension, and now we're at SEBA. So it comes to a point in time, is this a retaliation or an incident from the city of trying to make it more difficult for Mr. England to obtain SEBA benefits? I'm not sure I can answer that. I don't know the question to it, but that's how it was taken by my client. That's why we proceeded the way we did. We went to the circuit court because we believed that that was the more fair venue to get a fair hearing. We did not trust the city of Charleston to make that determination. If the ordinance is valid, determined to be valid, establishing these procedures, what would be the review process after the city of Charleston's determination? How would it proceed from there? That's a good point. That's what scared me the most, Your Honor. They're seeking that once they made that administrative ruling, that now I have to prove, by the manifest way of the evidence, that they made an error. I've already done that with the police finching board. Now I have to go to the circuit court. Now the burden is stacked way against me. In my view, it was their attempt to change the burden before the trial court, the circuit court, when I went and seeked benefits. I was already under the assumption and the belief that we're going to get denied at the city, because we've been denied every other time, that now if we go through this process, we can appeal it and argue that point at a later date. But in our opinion, we just thought it would save time to go in and file with the circuit court and seek a fair hearing there and have them make a determination whether or not this ordinance that was created after our application was valid and whether we had to perform by it. Is there anything in the statute or anything in case law that's interpreted in the statute that identifies who the original finder of fact is to be in this type of benefits determination? The CEBA is silent on that issue. I think that the courts, the Supreme Court and other courts, I would concede that point. I haven't found anything in the CEBA that would direct who is supposed to make that determination. But when there's a question, I always go to the courts to make a determination, not an agency that's set up by the individual who I'm eventually going to be the opponent to. I think the courts are more of a balanced, fair indicator of what the facts are and whether somebody's complied with it. So that's the route that I went. That would always be the argument in any administrative proceeding, though, wouldn't it? It would. It definitely would. And that's why we turned to the legal aspect of it and saying, well, where the statute enables them, where did legislature authorize them to create such a statute? And I can't find it. They say it's to Mr. Isley's defense. He states it's through the Illinois Municipal Code. Well, the sections they cite in that is very similar to the sections that are cited by the Fire Protection District Act. Excuse me, the Orland Fire Protection District. In that act, they make the same similar arguments, the same provisions, and the court does not extend that to whether they can make decisions with regards to eligibility of the SEBA. Instead, they say that SEBA is a separate benefit complied by statute, not under the Fire Protection District Act, not under the Municipal Code. So they do not have the authority to create administrative agencies. And that's what's the difference here, because there hasn't been any authority granted, not under the Constitution, not under statute. I don't want to belabor that point and get to my next argument if I have a few moments. With regards to whether or not the trial, whether or not the decision that the circuit court made in its declaratory judgment that Mr. England suffered a catastrophic injury in responding to what he reasonably believed to be an emergency, the defendant makes a lot of arguments about the Gaffney versus the Board of Trustees in Orland Park District and its definition of emergency. I'm not here to contest that. In fact, I think that's the correct definition. It does criticize the circuit court for not announcing that in its decision, but the defendant didn't argue that in its written argument, and this is the first time for this court that has made these arguments about that definition. But regardless, the definition, the circuit court finally fits that definition. And you have to look at the facts. In this case, Officer England, on December 7, 2008, responded to an emergency called by an emergency dispatch officer, a 911 dispatch officer, told Officer England specifically that the chief of police, and I put that in my brief, but I apologize, it was Adam 49 is what he said. Adam 49 requests an officer to be dispatched to Casey's General Store immediately. Officer England knows that Adam 59 is the call sign for the chief of police. He testified to that fact in a number of different hearings. So that's all the information he asked. He asked for any additional information. None was forthcoming. They didn't have any. So he proceeded to Casey's General Store, which was a short drive up. Now, at that time, he reasonably believed that there was something wrong at Casey's General Store, and his actions showed that. In fact, he parked across the street, not with sirens blazing or anything like that, but he parked across the street, not in front of Casey's, but he didn't know what was going on. He cautiously approached from the north, didn't see Chief Police Jenkins' vehicle, did not see his personal vehicle, didn't see the chief. So then he's thinking, well, maybe there's something going on inside of Casey's, so he cautiously looks inside of Casey's. Nothing's going on there. So he goes in and clears the, makes sure no one's in distress, no one's hurt, checks the bathrooms, asks the employees in Casey's General Store, do you know why I was called here? They have no idea. They have nothing. Then he calls dispatch back and says, have you got back a hold of the chief of police to see what's going on with what's the call about? We can't reestablish contact with the chief of police. Just five minutes ago, the chief called for 911. So now he's thinking, well, is the chief hurt? Is the chief in trouble? What's going on with this particular call? His heightened, I call it heightened degree of anxiety or heightened, he becomes more concerned that there's an emergency, not less, because there's nothing there. So then he tries to call his superior officer, Sergeant Peterson, back at the precinct. Can't get a hold of him. Now, he did testify that sometimes the receptions in the basement of the police station is disrupted, so it could have been that, but he wasn't for sure. So that's when he tells the dispatch officer that we are going, I'm going to relocate back to the police station. That's when he suffers a scatastrophic injury when he was taken off the call. We still don't know exactly what the call was about, not 100% sure. We have guesses, but we don't know for 100% certainty what the call actually entailed. The counsel argues about the definition of emergency, but doesn't really address the two words preceding that in the definition. Is that reasonably believed? Somebody can reasonably believe that there's an emergency, and it turns out that the emergency doesn't exist. For instance, if I walk into a neighbor's house, and I see a kid playing by the pool, a neighbor kid playing by the pool, and I walk in, I hear a splash, and I hear someone call for help. I reasonably believe that that kid fell in the pool and needs help, so I race out there. But I find that the kid just threw something into the water and was playing, that he was a lifeguard or was trying to save him. That doesn't mean that my actions and my thought process didn't reasonably believe there was an emergency. This case, same way. An officer in England would be illogical to think that you're being dispatched by an emergency operator and it's not an emergency. That doesn't make any sense. You're going to believe that there's an emergency there, and then when you can't find anything that's going on, your mind's going to start to race about all the scenarios. An officer in England testified to that. I thought there may be another crime on another part of town, or I was given the wrong address. They sent me to Casey's General Store when they were going to rob the gas station in the west side of town. The court points out that Officer Jenksins could have been hurt. I believe that, I see that, I don't know, does that mean I'm up? You have until the red light. Okay, thank you. I apologize. A couple final points. The defendant, I believe, is analyzing this definition of emergency from a hindsight perspective. In other words, he's looking at the past. Well, there wasn't no emergency, so there couldn't have been any belief that there was an emergency. Like I said before, a reasonable belief of an emergency can exist when the ultimate result is there was no emergency. It can't happen. It also seems that the defendant is arguing that Officer England could or should have just simply walked away when he came to Casey's. Nobody's there. Nobody's in distress. Let's just call it a day. It doesn't make any sense. It isn't what we want our public safety employees to do. If my mother or somebody called 9-1-1 or pressed a button on her emergency necklace and they gave the wrong address, emergency shows up at that address, nobody's here, nobody knows what I'm talking about, call it off. Or is unable to give the right address. Or there was a mistake about the address. It doesn't mean that the call is over. There's answers to it. So I see that my time is up, and I appreciate your time, and thank you. All right, thank you. Mr. Isley, rebuttal? Yes, thank you, Heather. Starting with counsel's argument about what's an emergency first, I did note from his briefs and, in fact, from the circuit court's decision, that there was, in order to show there was an emergency here, proof of an emergency, they cite to him being cautiously active. In other words, cautiously approaching cases, cautiously looking inside cases, having a heightened awareness because, especially since there wasn't anything there, having a heightened awareness that something else might be going on somewhere else in the village. Again, all of these don't rise to the level of an emergency as GAFNI requires. But GAFNI, again, requires that there be an unforeseen circumstances involving eminent danger to a person or property requiring an urgent response. And these things are missing in this case. I don't know. I think some people would say if a case looks almost vacant, you ought to exercise extreme caution in entering it because there may be somebody behind the counter with a gun pointed at the cashier's head. I mean, when I walk into those stores, I look to see who's at the counter and see if there are any other people in there, and I don't think I'm extra cautious. I just think I thought that's why they put up cases in places like that so they could be robbed because it's so convenient. Well, that's sarcasm. Yes. I mean, I can understand coming to cases, seeing it empty, and wondering if something's going on that's untoward. But it's in response to your chief. The less information you're given, it might heighten your awareness even more. It might heighten your awareness. Because the less information I'm given, I'm thinking, he doesn't have time to give that information. It's just, I've got to be there now because something's going on. But there is a certain amount of speculation that has to occur in order to determine to oneself, well, there is a danger, there's a hazard going on. I mean, he's got to speculate that. And in this case, he would have needed to do that because once he went to cases, he found that nothing was going on. And there was also, you know, there was not a reason for an urgent response. And I go back to Springborn and those officers that were found to have responded to what they reasonably believed was an emergency. One officer who sees, you know, a field of asphalt debris that he's got to either clear or protect oncoming traffic from. Another officer in the same case that finds a downed utility pole in the middle of the street that still has live wires going on. He's got to clear out of the roadway to protect the traffic. These are clear, these aren't speculative, these are clear hazards involving imminent danger. So I guess I, does the court really want to go so far as to make such a broad reading of what's reasonably considered to be an emergency to be a person's speculation of what's there or not? And whether, and Springborn actually goes into whether or not the officer or police, the police officer or the firefighters belief was reasonable that there was an emergency. And I simply don't believe that there was a reasonable belief in this case. Also, I'd like to note that as counsel mentioned, you know, Ingham was dispatched by a 911 call center. But we know from the Bremer v. City of Rockford case that just because you're dispatched by a 911 call center doesn't make the call automatically an emergency. Whether an event is an emergency can change as the circumstances change. So a person can be called out for any number of things that aren't necessarily emergencies. And we had a witness from the CCOM 911 call center say that sometimes people are called out for false alarms. And it turns out that there is no real reason for the call. As to counsel, yes. You're out of time. I'd like you to complete the thought here. Okay, thank you. I'll try to make it brief. As to counsel's argument about whether our city has powers to create such an ordinance, we have the implied powers given to it by the municipal code that allows it to decide other cases in other hearings. And I should note that the Fire Protection District case only gave authority through the Fire Protection Act. An act that's different than the municipal code and gives fewer rights, fewer powers than the municipal code. So the municipality is given more powers here in the municipal code than are given to the Fire Protection District under the Fire Protection Act. I'll conclude with that. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue.